**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE TIMOTHY M. REIF, JUDGE**

| | | |
|---|---|---|
| Deosen Biochemical (Ordos) Ltd., | ) | |
| *Plaintiff*, | ) | Court No.: 25-00145 |
| v. | ) | |
| United States, | ) | |
| *Defendant*, | ) | |
| and | ) | |
| CP Kelco U.S., Inc., | ) | |
| *Defendant-Intervenor*. | ) | |

<u>**PROPOSED ORDER**</u>

Upon the motion of the Plaintiff Deosen Biochemical (Ordos) Ltd. for judgment on the agency record, and all other pertinent papers and proceedings herein, it is hereby,

**ORDERED**, that Plaintiff's motion for judgment on the agency record is granted; and it is further

**ORDERED** that this action be remanded to the U.S. Department of Commerce for proceedings consistent with this Court's opinion.

**SO ORDERED.**

_____
Hon. Timothy M. Reif, Judge

Date: _____, 2026
New York, New York

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE TIMOTHY M. REIF, JUDGE**

| | | |
|---|---|---|
| ———————————————— | ) | |
| Deosen Biochemical (Ordos) Ltd., | ) | |
| | ) | |
|     *Plaintiff*, | ) | Court No.: 25-00145 |
| | ) | |
|     v. | ) | |
| | ) | |
| United States, | ) | |
| | ) | |
|     *Defendant,* | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CP Kelco U.S., Inc., | ) | |
| | ) | |
|     *Defendant-Intervenor*. | ) | |
| ———————————————— | ) | |

**PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade, Plaintiff Deosen Biochemical (Ordos) Ltd. ("Deosen Ordos") hereby moves for judgment upon the agency record with respect to the final results of the 10th administrative review of the antidumping duty order on xanthan gum from China issued by the U.S. Department of Commerce ("Commerce"). *Xanthan Gum From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2022–2023*, 90 Fed. Reg. 22,240 (Dep't of Commerce, May 27, 2025) ("Final Results").

Plaintiff respectfully requests that the Court find Commerce's Final Results unsupported by substantial evidence and otherwise not in accordance with law, and enter judgment in favor of the Plaintiff.

Respectfully submitted,

_/s/ Lian Yang_____
Lian Yang
Elio Gonzalez
Eric Xie
ALSTON & BIRD LLP
950 F St N.W.
Washington D.C. 20004
(202) 239-3490
Lian.Yang@alston.com

*Counsel for Deosen Ordos*

Dated: February 27, 2026

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| Deosen Biochemical (Ordos) Ltd., | ) |
| *Plaintiff*, | ) |
| v. | ) Court No.: 25-00145 |
| United States, | ) |
| *Defendant*, | ) |
| and | ) |
| CP Kelco U.S., Inc., | ) |
| *Defendant-Intervenor*. | ) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF DEOSEN BIOCHEMICAL (ORDOS) LTD.'S MOTION FOR JUDGMENT ON THE AGENCY RECORD

Lian Yang
Elio Gonzalez
Eric Xie
ALSTON & BIRD LLP
950 F St N.W.
Washington D.C. 20004
(202) 239-3490
Lian.Yang@alston.com

*Counsel to Deosen Ordos*

Dated: February 27, 2026

## TABLE OF CONTENTS

I.    RULE 56.2 STATEMENT ................................................................................ 1

    A.    Determination Presented for Review ...................................................... 1

    B.    Issues Presented .................................................................................... 1

II.   FACTUAL BACKGROUND ......................................................................... 1

III.  LEGAL STANDARD .................................................................................... 4

IV.   ARGUMENT ................................................................................................. 5

    A.    Commerce Should Have Calculated Deosen USA's Credit Expenses As
        Reported ................................................................................................. 5

        1.    Commerce's Use of the Relevant Date for Calculating Deosen's Credit
            Expenses Was Wrong ..................................................................... 5

        2.    Deosen USA Reasonably Responded to Commerce's Request for Date of
            Shipment ......................................................................................... 9

    B.    The Department's Use of AFA is Not Supported by Substantial Evidence
        or in Accordance with Law .................................................................. 10

        1.    Deosen did not withhold information and the record otherwise contained
            usable information regarding date of shipment ................................ 11

        2.    Commerce's determination to apply an adverse inference is unsupported
            by substantial evidence and not in accordance with law .................... 18

V.    CONCLUSION ............................................................................................ 22

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*ABB Inc. v. United States*,
355 F. Supp. 3d 1206 (Ct. Int'l Trade 2018) ............................................................................17

*Consol. Edison Co. v. N.L.R.B.*,
305 U.S. 197 (1938)...................................................................................................................4

*Dalian Meisen Woodworking Co. v. United States*,
2022 Ct. Int'l Trade LEXIS 52 (May 12, 2022) .......................................................................19

*Dalian Meisen Woodworking Co. v. United States*,
571 F. Supp. 3d 1364 (Ct. Int'l Trade 2021) ............................................................................18

*Gerald Metals, Inc. v. United States*,
132 F.3d 716 (Fed. Cir. 1997)....................................................................................................4

*Hung Vuong Corp. v. United States*,
483 F. Supp. 3d 1321 (Ct. Int'l Trade 2020) .....................................................................16, 17

*Hyundai Electric & Energy Systems Co., Ltd. v. United States*,
578 F. Supp. 3d 1245 (Ct. Int'l Trade 2022) ............................................................................21

*Mittal Steel Point Lisas Ltd. v. United States*,
491 F. Supp. 2d 1222 (Ct. Int'l Trade 2007) .....................................................................7, 8, 9

*Mittal Steel Point Lisas, Ltd. v. United States*,
502 F. Supp. 2d 1345 (Ct. Int'l Trade 2007) ............................................................................8

*Mittal Steel Point Lisas Ltd. v. United States*,
548 F.3d 1375 (Fed. Cir. 2008)..............................................................................................8, 9

*Mueller Comercial de Mexico v. United States*,
753 F.3d 1227 (Fed. Cir. 2014).................................................................................................18

*N.L.R.B. v. Columbian Enameling & Stamping Co.*,
306 U.S. 292 (1939).....................................................................................................................4

*Nippon Steel Corp. v. United States*,
337 F.3d 1373 (Fed. Cir. 2003)............................................................................................19, 21

*Nippon Steel Corp. v. United States*,
458 F.3d 1345 (Fed. Cir. 2006)....................................................................................................4

*Shanghai Taoen Int'l Trading Co. v. United States*,
360 F. Supp. 3d 1339 (Ct. Int'l Trade 2005) ............................................................................19

*Universal Camera Corp. v. N.L.R.B.*,
  340 U.S. 474 (1951)..................................................................................................4

**STATUTES**

19 U.S.C. § 1516a(b)(1)(B)(i).....................................................................................4

19 U.S.C. § 1677a(b) ..................................................................................................5

19 U.S.C. § 1677b(a) ..................................................................................................5

19 U.S.C. § 1677e(a).............................................................................................18, 19

19 U.S.C. § 1677e(a)(1)......................................................................................11, 14, 18

19 U.S.C § 1677e(a)(2)..............................................................................................11

19 U.S.C. § 1677e(a)(2)(A).....................................................................................11, 18

19 U.S.C. § 1677e(a)(2)(D)..........................................................................................16

19 U.S.C. § 1677e(b) ..................................................................................................18

19 U.S.C. § 1677m(d)......................................................................................11, 15, 16, 17

**OTHER AUTHORITIES**

19 CFR 351.402(b) .....................................................................................................7

*Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 88 Fed. Reg.
  62,322 (Dep't of Commerce Sept. 11, 2023), P.R. 34.................................................2

*Verification Report of the U.S. Sales Response of Deosen USA Inc. in the Administrative
  Review of Xanthan Gum from the People's Republic of China* (Jan. 24, 2025)
  ("Deosen USA Verification Report"), C.R. 226; P.R. 304..............................................3

*Xanthan Gum From the People's Republic of China: Amended Final Determination of
  Sales at Less Than Fair Value and Antidumping Duty Order*, 78 Fed. Reg. 43,143
  (Dep't of Commerce July 19, 2013) ....................................................................1, 2

*Xanthan Gum From the People's Republic of China: Final Results of Antidumping Duty
  Administrative Review and Final Determination of No Shipments; 2022–2023*, 90
  Fed. Reg. 22,240 (Dep't of Commerce, May 27, 2025), P.R. 336 ................................. passim

*Xanthan Gum From the People's Republic of China: Preliminary Results of Antidumping
  Duty Administrative Review, Rescission, in Part, and Preliminary Determination of
  No Shipments; 2022-2023, 89 Fed. Reg. 68,136 (Dep't of Commerce Aug. 23, 2024)............3*

On behalf of Plaintiff Deosen Biochemical (Ordos) Ltd. ("Plaintiff" or "Deosen Ordos"), we respectfully submit this opening brief in Plaintiff's challenge to certain aspects of the U.S. Department of Commerce's ("Commerce's") final results of the 10th administrative review of the antidumping duty order on xanthan gum from China. *Xanthan Gum From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2022–2023*, 90 Fed. Reg. 22,240 (Dep't of Commerce, May 27, 2025) ("Final Results"), P.R. 336.

## I.    RULE 56.2 STATEMENT

### A.    Determination Presented for Review

Plaintiff seeks judicial review of the final results of the 10th administrative review of the antidumping duty order on xanthan gum from China issued by the Department. *Xanthan Gum From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2022–2023*, 90 Fed. Reg. 22,240 (Dep't of Commerce, May 27, 2025) ("Final Results"), P.R. 336, and accompanying Issues and Decision Memorandum ("IDM"), P.R. 327.

### B.    Issues Presented

Plaintiff raises the following challenge to the Final Results:

1.    Commerce's calculation of Deosen's credit expenses is unsupported by substantial evidence and is contrary to law.

2.    Commerce's determination to use partial adverse facts available ("AFA") is unsupported by substantial evidence and is contrary to law.

## II.    FACTUAL BACKGROUND

On July 19, 2013, Commerce published the antidumping duty ("AD") order on xanthan gum from China. *Xanthan Gum From the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order*, 78 Fed. Reg. 43,143

(Dep't of Commerce July 19, 2013) ("Order").  On September 11, 2023, Commerce initiated a review of the Order with respect to Deosen Ordos and other Chinese xanthan gum producers and/or exporters covering the July 1, 2022 through June 30, 2023 period of review ("POR"). *See Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 88 Fed. Reg. 62,322 (Dep't of Commerce Sept. 11, 2023) ("Initiation Notice"), P.R. 34.  On September 29, 2023, Commerce selected Deosen Ordos as a mandatory respondent for individual examination.

From November 2023 through July 2024, Deosen Ordos and its affiliated U.S. importer Deosen USA Inc. ("Deosen USA") (collectively, "Deosen") timely responded to Commerce's initial and four supplemental questionnaires.  In the questionnaire responses, Deosen reported all its sales as constructed export price sales because Deosen Ordos sold the subject merchandise first to Deosen USA, which re-sold the subject merchandise to unaffiliated customers in the United States.  In response to Commerce's request for the date of shipment in the Section C questionnaire concerning U.S. sales of subject merchandise, Deosen reported the date of Deosen USA's invoice to unaffiliated customers, explaining that the dates were the same because Deosen USA issued the invoice around the same time as it shipped merchandise to its customers. *See* Deosen's Section C Questionnaire Response (Nov. 29, 2023), at 11-12 ("Deosen ICQR"), C.R. 94, P.R. 100; Deosen Ordos' Supplemental Questionnaire Response (May 1, 2024), at 9 ("Deosen Ordos SQR1"), C.R. 128-129; P.R. 195.  Deosen adopted this reporting approach for goods shipped from Deosen USA's warehouse to final customers ("Warehouse Sales") as well as for goods shipped directly from China to final customers without stopping at Deosen USA's warehouse ("Direct Delivery Sales").  Deosen explained that it used this approach because Deosen USA did not separately record the shipment date in the ordinary course of business, and Deosen USA's invoice date approximated the date of shipment for Warehouse Sales and the date of delivery for Direct Delivery Sales.

Deosen ICQR at 11-12, C.R. 94, P.R. 100.  To report credit expenses also requested in the Section C questionnaire, Deosen USA calculated the expenses using the number of days between the reported shipment date and receipt of payment from customers. *Id.* at 28.

On August 23, 2024, Commerce published the preliminary results of the review.  *See Xanthan Gum From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, Rescission, in Part, and Preliminary Determination of No Shipments*; 2022-2023, 89 Fed. Reg. 68,136 (Dep't of Commerce Aug. 23, 2024) ("Preliminary Results"), P.R. 275, and accompanying Preliminary Decision Memorandum (Aug. 6, 2024) ("PDM"), P.R. 262. Using the information Deosen reported, Commerce preliminarily calculated a dumping margin of 1.56 percent for Deosen Ordos.

Commerce conducted a verification of Deosen Ordos in Inner Mongolia, China from October 21-25, 2024, and of Deosen USA in Piscataway, New Jersey from November 6-8, 2024. In its Deosen USA verification report, Commerce noted as an issue for the first time that Deosen reported the date of shipment according to the final U.S. customer invoice date for Direct Delivery Sales.  *See Verification Report of the U.S. Sales Response of Deosen USA Inc. in the Administrative Review of Xanthan Gum from the People's Republic of China* (Jan. 24, 2025) ("Deosen USA Verification Report"), C.R. 226; P.R. 304.

Deosen submitted a case brief further explaining the use of Deosen USA's invoice date to unaffiliated customers as the shipment date for Direct Delivery Sales.  *See* Case Brief of Deosen Ordos and Deosen USA (Feb. 11, 2025) ("Deosen's Case Brief"), C.R. 238; P.R. 320.  No other parties commented on this issue.

On May 27, 2025, Commerce published the Final Results.  In the IDM, Commerce found that for Direct Delivery Sales, Deosen withheld information on the shipment date from its factory

in China and failed to cooperate to the best of its ability. As such, Commerce applied facts otherwise available with an adverse inference ("AFA") for those sales. As AFA, Commerce used the largest reported difference between Deosen's shipment date and payment date in the U.S. sales database (which was based on a Warehouse Sale) to calculate the credit expenses for all Direct Delivery Sales. *See* Deosen Final Analysis Memorandum, dated May 20, 2025, at 3-4, C.R. 247, P.R. 332. Primarily due to this change in the calculation of credit expenses, Deosen Ordos' dumping margin increased from 1.56 percent to 6.46 percent in the Final Results.

### III.    LEGAL STANDARD

The Court must hold unlawful any aspect of Commerce's final results that is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). It must be "more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (quoting *N.L.R.B. v. Columbian Enameling & Stamping Co*., 306 U.S. 292, 300 (1939)).

The substantial evidence standard requires more than mere assertion of "evidence which in and of itself justified {the determination}, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn." *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997). Rather, substantial evidence supporting an agency determination must be based on the whole record, and the Court shall take into account not only the information that supports the agency's decision but also whatever in the "record fairly detracts from the weight." *Nippon Steel Corp.*, 458 F.3d at 1351.

## IV.    <u>ARGUMENT</u>

Deosen brings this action to challenge Commerce's calculation of Deosen's credit expenses in the Final Results, which was the primary change that Commerce made from its Preliminary Results.  Commerce incorrectly found that Deosen USA failed to report shipment dates for its Direct Delivery Sales and proceeded to calculate Deosen USA's credit expenses for these sales based on AFA, using the largest number of days between Deosen's reported date of shipment and payment date in the sales database to determine the number of days during which credit expenses were incurred.  Deosen contends that Commerce erred in the approach it took to determine the relevant date for calculating Deosen's credit expenses, and its use of partial application of AFA  is unjustified.

### A.    <u>Commerce Should Have Calculated Deosen USA's Credit Expenses As Reported</u>

#### 1.    Commerce's Use of the Relevant Date for Calculating Deosen's Credit Expenses Was Wrong.

In determining whether subject merchandise is being sold at less than normal value, Commerce compares export price or constructed export price ("CEP") with normal value.  19 U.S.C. § 1677b(a).  The term CEP is defined as "the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter…." 19 U.S.C. § 1677a(b). Because Deosen Ordos sells xanthan gum to its U.S. affiliated importer, Deosen USA, Deosen reported all its sales as CEP sales in accordance with the statute. In accordance with Commerce's questionnaire instructions, Deosen reported all sales by Deosen USA to unaffiliated customers during the POR. *See* Deosen ICQR at 2 and Exhibit C-1, C.R. 94-96, P.R. 100-102; Deosen Third Supplemental Questionnaire Response (July 11, 2024) at 1-2 and Exhibits SSC-1 and SSC-2

(revised U.S. sales database), C.R. 150-155, P.R. 244.

In reporting its sales to unaffiliated customers, Deosen USA identified two sales terms in its database based on its practice: Free On Board ("FOB") and Delivered Duty Paid ("DDP").  *See* Deosen ICQR at 13, C.R. 94, P.R. 100.  Deosen USA uses the term "FOB" to refer to sales where Deosen USA sold xanthan gum from its warehouse and U.S. customers were responsible for picking up the goods from the warehouse, *i.e.,* Warehouse Sales.  The term "DDP" refers to those sales for which Deosen USA was responsible for delivering the goods to the unaffiliated customer's designated place.  During the POR, these DDP sales involved goods that were shipped directly from China to final customers without stopping at Deosen USA's warehouse (*i.e.,* Direct Delivery Sales).

In the initial Section C questionnaire, Commerce requested parties to "Report the date of shipment from the factory or distribution warehouse to the customer."  *See* Initial Questionnaire, at C-10-11 (Sept. 29, 2023), P.R. 40-43.  Because this section of the questionnaire requested information on CEP sales that Deosen USA made to unaffiliated U.S. customers.  Deosen understood Commerce's instruction as requesting Deosen to report the date of shipment from Deosen USA's perspective.  Thus, Deosen reported that the date of shipment was the same as the invoice date because Deosen USA generally issued the invoice around the same time that it shipped merchandise to the final U.S. customer for Warehouse Sales (namely, around the time when the customer picked up merchandise from the U.S. warehouse), and upon delivery for Direct Delivery Sales, which were sold under the DDP term.  *See* Deosen ICQR at 11-12, C.R. 94, P.R. 100.  Because Deosen USA does not separately record date of shipment in its accounting system in the ordinary course of business, it reported Deosen USA's invoice date to the final U.S. customer as an estimated proxy of the date of shipment.  *Id.*  As a result, Deosen's Section C sales database as

submitted to Commerce shows that for both Warehouse Sales and Direct Delivery Sales, the shipment dates were the same as the invoice dates.

In the Final Results, Commerce found that Deosen correctly reported the shipment dates for Warehouse Sales, but for Direct Delivery Sales, Deosen should have reported the date when xanthan gum was shipped from Deosen Ordos' factory in China. IDM at 12-14.

To compare U.S. price with normal value to calculate the dumping margin, Commerce adjusts CEP sales "for expenses associated with commercial activities in the United States that relate to the sale to an unaffiliated purchaser, no matter where or when paid." 19 CFR 351.402(b). Deosen USA's calculation and reporting of the credit expenses properly reflected the costs associated with the money being owed to Deosen USA after it had sold the merchandise to the customer but had not been paid. With respect to the Direct Delivery Sales at issue here, Deosen USA sold the goods to unaffiliated customers under the DDP term. Deosen USA sold the goods when it issued the invoice to the customer. Deosen USA began to accrue an opportunity cost only after it sold/invoiced the customer. Deosen's calculation, using the number of days between the reported date of shipment, which was the invoice date, accurately reflected the number of days of credits being extended. By contrast, Commerce's approach – using the date when subject merchandise was initially shipped from Deoen Ordos' factory in China, would overstate Deosen USA's credit expenses, as credit expenses did not begin to accrue before it invoiced and sold the goods to the customer.

The courts have addressed a similar situation in *Mittal Steel*, where Commerce requested a voluntary remand to calculate credit expenses from the date of invoice instead of date of shipment from the foreign country (the foreign port, more specifically). *Mittal Steel Point Lisas Ltd. v. United States*, 491 F. Supp. 2d 1222 (Ct. Int'l Trade 2007). In *Mittal Steel*, Mittal shipped

merchandise to its U.S. affiliate, which unloaded it and arranged for its delivery to U.S. customers (and the merchandise was not stored at a warehouse before it was sold). Thus, the transaction flow was similar to Deosen's Direct Delivery Sales. The Court considered that "{w}hether goods are shipped to the unaffiliated customers directly from the foreign port or whether they are warehoused in the United States is important to the determination of whether credit expenses begin accruing, and whether there are U.S. carrying costs." *Id.* at 1230. The Court notes that credit expenses "are the costs associated with money being owed to the seller after it has sold its merchandise to the customer but has not been paid." *Id*. Commerce requested a voluntary remand because where Commerce used the invoice date as the date of sale, it was "inconsistent for Commerce to then calculate credit expenses beginning on the date of shipment." *Id*. at 1232. On remand, Commerce found that because it had used the date of invoice as the date of sale, "it was appropriate to calculate credit expenses from the date of invoice, rather than the date of shipment," and this determination was sustained by the CIT. *Mittal Steel Point Lisas, Ltd. v. United States,* 502 F. Supp. 2d 1345, 1346-47 (Ct. Int'l Trade 2007).

On appeal, although the appellant had failed to preserve the issue for appeal, the U.S. Court of Appeals for the Federal Circuit nonetheless opined that it "would affirm Commerce's determination to begin the credit expense period on the invoice date as supported by substantial evidence and not contrary to law." *Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1384 (Fed. Cir. 2008). The Federal Circuit observed that Commerce's standard practice is to begin calculating credit upon the date of shipment because at that point the seller has extended credit to a specific buyer. *Id.* at 1385. However, under the circumstances of the case, the Federal Circuit found that it was appropriate for Commerce to calculate credit expenses beginning on the invoice date because the record demonstrated that the material terms of sale were not set before the invoice

date. *Id*.

Here, Deosen reported "the appropriate date of sale is the commercial invoice date because it is the date on which the price and quantity are set and recorded in Deosen USA's accounting system." *See* Deosen's ICQR at 10, C.R. 94, P.R. 100; *see also* Deosen's Section A Questionnaire Response (Nov. 3, 2023) ("Deosen IAQR") at 11-12, C.R. 20, P.R. 82 ("Deosen has used the date of the commercial invoice Deosen USA issues to unaffiliated U.S. customers as the 'date of sale'…{t}he invoice date is the first date on which both the quantity and sales price become firm."). Commerce confirmed the invoice date was an appropriate date of sale. PDM at 16, P.R. 262 (unchanged in Final Results, P.R. 336, 327). Because the invoice date is the appropriate date of sale, consistent with *Mittal Steel*, Commerce should have calculated credit expenses using Deosen USA's invoice date, as Deosen reported.

## 2. Deosen USA Reasonably Responded to Commerce's Request for Date of Shipment

Deosen's reporting of shipment date for its Direct Delivery Sales was reasonable. Commerce agreed with Deosen's approach regarding Warehouse Sales. *See* IDM at 13 ("We also find that for sales where Deosen USA's U.S. customers pick up goods from Deosen's USA warehouses, Deosen's reported shipment date was reported accurately…."). Commerce's acceptance of Deosen's reporting for Warehouse Sales from *Deosen USA's* perspective undermines Commerce's conflicting position that for Direct Delivery Sales the date of shipment should have been reported from *Deosen Ordos'* perspective. Commerce's questionnaire instruction ("Report the date of shipment from the factory or distribution warehouse to the customer") was clearer with respect to Warehouse Sales – Deosen USA ought to report the date when goods were "shipped" from its U.S. warehouse. In Warehouse Sales, the title of the goods transferred from Deosen USA to the unaffiliated customer when the customer picked up the goods from Deosen USA's

warehouse. Thus, Deosen USA considered the goods "shipped" and delivered to the customer at such time. In the same vein, in Deosen's Direct Delivery Sales, the title of the goods did not transfer from Deosen USA to the unaffiliated customer until the goods were shipped and delivered to the customer's designated location in the United States under the DDP term. That occurred at an intermediate location in the United States like the Warehouse Sales. Commerce's questionnaire instruction is less clear in this scenario. It was therefore reasonable for Deosen to use the same logic for both scenarios and considered the goods "shipped" from an intermediate location in the United States to unaffiliated customer upon delivery. Moreover, like with Warehouse Sales, Deosen USA did not separately record the date of shipment or delivery to final customers in the ordinary course of business, and the invoice date was a reasonable proxy.

Finally, while Commerce ties the date of shipment to the calculation of credit expenses. its questionnaire does not provide clear instruction as to which date of shipment should be used in CEP sales. To report credit expenses, the questionnaire simply instructs respondents to report "the unit cost of credit computed at the actual cost of short-term debt incurred," and the expense "should be calculated and reported on a transaction-by-transaction basis using the number of days between date of shipment to the customer and date of payment," and respondents' short-term borrowing interest rate. *See* Initial Questionnaire, at C-21 (Sept. 29, 2023), P.R. 40-43. Was the shipment date from the foreign producer's factory, the date from the foreign port of export, or the U.S. affiliate's date of shipment to unaffiliated customers? In short, clarity is lacking, and Deosen's reporting was reasonable considering the ambiguity.

### B. The Department's Use of AFA is Not Supported by Substantial Evidence or in Accordance with Law

In response Commerce's initial questionnaire, Deosen reported Deosen USA's date of invoice to unaffiliated customers as the date of shipment. In the Final Results, Commerce applied

AFA with respect to Deosen's date of shipment for Direct Delivery Sales claiming Deosen withheld the date of shipment information it requested in the initial questionnaire.  According to Commerce, Deosen should have reported the date when xanthan gum was shipped from Deosen Ordos' factory for Direct Delivery Sales.  Commerce further determined that Deosen failed to cooperate with Commerce's initial questionnaire by not acting to the best of its ability and applied an adverse inference.  As discussed below, Commerce's determinations that Deosen withheld information and did not cooperate to the best of its ability are unsupported by substantial evidence and not in accordance with law.

### 1. Deosen did not withhold information and the record otherwise contained usable information regarding date of shipment

Commerce applied "facts available under {19 U.S.C. § 1677e(a)(1) and (2)}" in the Final Results after it determined that Deosen "withheld shipment date information as requested by Commerce in its initial questionnaire."  IDM at 15, P.R. 327.  Under these provisions of the statute, Commerce uses facts available if necessary information is not available on the record, or if an interested party withholds information that has been requested by Commerce.  19 U.S.C. §§ 1677e(a)(1) & (a)(2)(A).  Commerce's use of facts available is "subject to {19 U.S.C. § 1677m(d)}," which states that if "Commerce determines that a response to a request for information does not comply with the request, Commerce shall promptly inform the person submitting the response of the nature of the deficiency, and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency…."

Here, Deosen did not withhold information from Commerce.  Rather, in responding to the initial Section C questionnaire, Deosen provided Commerce with a proxy for date of shipment based on its understanding that Commerce was requesting information related to Deosen USA's sales to the final U.S. customers.  As important context, Commerce's initial Section C

questionnaire requested certain information from Deosen that related to its CEP sales. Thus, much of the information reported by Deosen in this section of the questionnaire related to *Deosen USA's* sales to unaffiliated customers because those were the sales relevant to Commerce's inquiries.

In the initial Section C questionnaire, Commerce requested the following: "Report the date of shipment from the factory or distribution warehouse to the customer." *See* Commerce's Initial Questionnaire, P.R. 40-43. In response, Deosen reported that for Warehouse Sales, the "date of shipment is the same date as the invoice date as Deosen USA issues the invoice around the same time when it ships to the customers," (namely, when the customer picked up the goods from Deosen USA's warehouse). For Direct Delivery Sales, there was no date of shipment from Deosen USA's distribution warehouse because those sales were shipped directly from China to the final U.S. customer. Thus, Deosen used as a proxy the date of Deosen USA's invoice to the final U.S. customer because it generally issues invoices when the merchandise is delivered to the customer for Direct Delivery Sales. In its response, Deosen also explained that Deosen USA's Quickbooks system does not separately record shipment date, which necessitated the reporting of a proxy date of shipment. Therefore, Deosen used the methodology described above to provide Commerce with the date of shipment being requested. Deosen was transparent with the methodology it used to report the date of shipment since the beginning of the review with its response to the initial Section C questionnaire and did not withhold information requested by Commerce.

Moreover, there was no reason for Deosen to believe that Commerce expected a different date of shipment for Direct Delivery Sales because Commerce did not identify a deficiency with Deosen's reporting or otherwise instruct Deosen to modify its reporting for such sales. Instead, Commerce accepted the date of shipment and credit expenses as reported by Deosen in the Preliminary Results for both Warehouse Sales and Direct Delivery Sales and also accepted the date

of shipment as reported in the Final Results for Deosen USA's Warehouse Sales. If anything, Commerce's acceptance of the date of shipment reported by Deosen for Deosen USA's Warehouse Sales supports the reasonableness of Deosen's understanding that it had properly provided Commerce with the information Commerce requested. Moreover, Commerce's acceptance of the date of shipment for Warehouse Sales as reported by Deosen from the perspective of *Deosen USA* undermines Commerce's claim that Deosen should have reported date of shipment for Direct Delivery Sales from the perspective of *Deosen Ordos*.

Commerce did issue a supplemental questionnaire for further explanation on the date of shipment, but it did not identify any deficiency with Deosen's reporting methodology or otherwise clarify that it expected Deosen to report an alternative date of shipment. Indeed, Deosen made it clear in multiple responses to the supplemental questionnaire that its reported shipment dates were based on Deosen USA's invoice dates to unaffiliated customers, not the dates of shipment from Deosen Ordos' factory. Specifically:

- Question 17(f): Commerce asked Deosen to clarify why the reported shipment date was later than the date of export out of China and U.S. import/entry date for one Deosen USA invoice number (which was a Direct Delivery Sale, corresponding to three "DDP" sale sequences in the sales database). Deosen responded explaining that the shipment date was the same as Deosen USA's sale date, which was the invoice date. *See* Deosen Ordos SQR1 at 9, C.R. 128-129, P.R. 195. The three dates viewed together made it clear that the reported shipment date was not the date of shipment from Deosen Ordos' factory.

- Question 24: Commerce asked Deosen to explain why the shipment dates for three sale sequences were older than their respective sale dates. In response, Deosen explained that it incorrectly reported the dates of shipment from China for those three sale sequences and had corrected the dates in the updated database accompanying the supplemental questionnaire response. This again made it clear to Commerce that the reported shipment dates were not the dates when the goods were shipped from Deosen Ordos' factory. *See* Deosen Ordos SQR1 at 12, C.R. 128-129, P.R. 195.

- Question 28a and 28b: Commerce asked Deosen to clarify some credit expense values in the U.S. sales database. Commerce asked specifically for the invoice,

packing list and shipment documentation for one sale sequence, which was a Direct Delivery Sale, and asked for an explanation as to how Deosen calculated the credit expenses. In response, Deosen provided the requested documentation, reiterating the reported shipment date was the same as Deosen USA's invoice date, as confirmed by the submitted invoice. Deosen further explained that the calculated credit expenses for this Direct Delivery Sale reflected the fact the customer paid before the U.S. shipment date. Namely, the payment date was earlier than the shipment date, and the credit expense value was consistent with the formula used to calculated it {i.e., U.S. credit expenses = (payment date – shipment date) /365*annual interest rate}. *See* Deosen Ordos SQR1 at 13, C.R. 128-129, P.R. 195.

In addition to the narrative explanations, it was also apparent from Deosen's Section C sales databases, particularly reviewed in connection with the sales documentation on the record that included both Deosen USA's invoices to unaffiliated customers, that the reported shipment dates were based on Deosen USA's invoice dates, not Deosen Ordos' date of shipment from its factory.

Deosen was transparent with its methodology in reporting the date of shipment and did not withhold information requested. If Commerce disagreed with Deosen's reporting approach, it could have requested that Deosen provide such information following this supplemental questionnaire response; however, but it did not, despite issuing three more supplemental questionnaires to Deosen on other aspects of Deosen's responses. Thus, Commerce's finding that Deosen withheld information requested is unsupported by substantial evidence and not in accordance with law.

Similarly, assuming the dates of shipment from Deosen Ordos' factory in China were necessary for Commerce to calculate the credit expenses, Commerce's determination that necessary information is missing from the record under 19 U.S.C. § 1677e(a)(1) is flawed because information to ascertain this date is available on the record. Specifically, when it conducted the CEP verification at Deosen USA's facilities, Commerce reviewed information regarding the sales and distribution processes for the sales of subject merchandise in the United States. As part of that

process, Deosen USA "explained that subject merchandise usually takes 30-35 days to arrive in the United States." *See* Deosen USA's Verification Report at 6-7, C.R. 226, P.R. 304. Commerce further stated in its verification report that, "{s}ince products are delivered to the customer or warehouse, Deosen USA provides estimated delivery dates to customers. We noted no discrepancies." *Id.* at 7. Thus, because Commerce confirmed that it typically took 30-35 days for Deosen Ordos' subject merchandise to arrive in the United States, the date of shipment can be determined based on the entry date, which is reported in Deosen's sales database. Therefore, there is no necessary information missing from the record because information to ascertain the date of shipment from the factory in China is on the record. *See* Deosen's Submission of Revised Databases (Jan. 31, 2025) ("Deosen's Post-Verification Databases") at Exhibit 1, C.R. 233-236, P.R. 314. Moreover, Commerce's use of the largest difference between the reported shipment date and payment date in Deosen's sales base, which was over 480 days, grossly overstated the number of days during which Deosen accrued credit expenses. *See* Deosen Final Analysis Memorandum, dated May 20, 2025, at 4, C.R. 247, P.R. 332. This large number of days pertained to a Warehouse Sale rather than a Direct Delivery Sale and involved an invoice where the customer did not follow the payment term and was grossly late in paying. *See* Deosen's Post-Verification Databases, C.R. 233-236, P.R. 314.

The use of facts available is "subject to {19 U.S.C. § 1677m(d)}," which requires that if Commerce determines a response to a request for information does not comply with the request, Commerce "shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency…." In the Final Results, Commerce incorrectly dismissed the relevance of section 1677m(d), stating that it "was not aware of these deficiencies in the reported shipment

15

date for sales directly shipped from China to the final customer's designated place until verification." IDM at 15. As discussed above, since its response to the initial Section C questionnaire Deosen was clear with the methodology it used to report date of shipment and the reported shipment date clearly was not the shipment date from Deosen Ordos' factory. Deosen further clarified the reporting approach in the supplemental questionnaire response. A review the various dates including the shipment dates, invoice dates and date of entry of the goods into the United States in both of Deosen's sales database and representative transactional documents on the record would make it abundantly clear that Deosen reported shipment dates based on the date of Deosen USA's invoices to unaffiliated customers all along. Even so, Commerce never indicated to Deosen that it considered Deosen's response deficient or allow Deosen to remedy the alleged deficiency.

Commerce cites two CIT cases to support its statement that section 1677m(d), which requires Commerce to provide a respondent an opportunity to remedy or explain a deficiency in its response, is irrelevant. But these cases are distinguishable. *Hung Vuong Corp.* involved a situation where the respondent "discarded documents kept in the normal course of business," which prevented Commerce from conducting verification. *Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1346 (Ct. Int'l Trade 2020). In that case, Commerce was "unable to verify the negotiation of prices, quantities, and terms of sales because Hung Vuong deleted the emails that would have provided this information." *Id.* at 1348. This is different from the present situation where Deosen USA does not maintain date of shipment in the ordinary course of business and was transparent in its responses to Commerce that it was reporting a proxy for date of shipment, which Commerce initially accepted. In addition, the application of facts available in *Hung Vuong Corp.* was upheld on the basis that "Hung Vuong provided information that cannot be verified" under 19

U.S.C. § 1677e(a)(2)(D). This provision of the statute was not at issue in this review, and Commerce made no findings that the information Deosen provided could not be verified. Thus, *Hung Vuong Corp.* does not support Commerce's determination that it was excused from complying with section 1677m(d).

Similarly, *ABB Inc.* involved a situation where the respondent provided incomplete and inaccurate responses, and Commerce indicated that it was not aware of the deficiencies until the underlying information was provided at verification. *ABB Inc. v. United States*, 355 F. Supp. 3d 1206, 1222 (Ct. Int'l Trade 2018). In that case, the respondent "submitted no information, much less deficient information, and stated it had no such information to report." *Id*. It was not until Commerce sorted through the respondent's sales documentation at verification that it recognized that the respondent's documentation "was inconsistent with its reporting." *Id.* at 1222-23. In such a situation, the Court found that Commerce was not mandated to provide the respondent a subsequent opportunity to remedy the deficiency. By contrast, Deosen was consistent and transparent with how it reported date of shipment throughout the review. Commerce accepted Deosen's reporting in the Preliminary Results and only later after verification determined that it needed different information with respect to Direct Delivery Sales. Commerce never clarified that it was requesting a response on date of shipment from the perspective of Deosen Ordos for Direct Delivery Sales and from the perspective of Deosen USA for Warehouse Sales, nor did it indicate that it deemed Deosen's reporting deficient and provide Deosen an opportunity to remedy the situation.

In sum, Deosen did not withhold information requested by Commerce and provided the information it reasonably believed Commerce requested in a section of the questionnaire which sought information mainly related to Deosen USA. Because Deosen USA does not separately

record date of shipment in its records, it reported a proxy date of shipment by Deosen and informed Commerce in its questionnaire response of the reason for reporting invoice date as the date of shipment. Thus, Deosen did not withhold information requested by Commerce to permit the use of facts available under 19 U.S.C. § 1677e(a)(2)(A). In addition, the record contains information to ascertain the date of shipment from Deosen Ordos' factory in China. Thus, necessary information is not missing from the record to justify resorting to facts available under 19 U.S.C. § 1677e(a)(1).

### 2. Commerce's determination to apply an adverse inference is unsupported by substantial evidence and not in accordance with law

The statute provides that if Commerce establishes its authority to use facts available under 19 U.S.C. § 1677e(a), it may consider the use of an adverse inference when selecting among the facts available if it finds that an interested party failed to act to the best of its ability to comply with a request for information. 19 U.S.C. § 1677e(b). Commerce must first establish its authority to act under section 1677e(a) before it "may (but need not) take the second step of determining whether the respondent failed to cooperate by not acting to the best of its ability to comply with Commerce's request for information." *Dalian Meisen Woodworking Co. v. United States*, 571 F. Supp. 3d 1364, 1370 (Ct. Int'l Trade 2021) (internal citation omitted); *Mueller Comercial de Mexico v. United States*, 753 F.3d 1227 (Fed. Cir. 2014).

In the Final Results, Commerce found that Deosen failed to cooperate to the best of its ability with regard to the Direct Delivery Sales and applied AFA to the shipment date of those sales. IDM at 12-16, P.R. 327. As discussed in the preceding section, Commerce's determination to apply facts available under section 1677e(a) was unsupported by substantial evidence because Deosen reported the information Commerce requested by providing Deosen USA's invoice date as a proxy for the date of shipment. For Direct Delivery Sales, even if the appropriate date of

shipment is the date the merchandise shipped from China, that information is readily ascertainable from the record, and thus, there is no gap to justify the use of facts available. The application of an adverse inference is a separate determination from a finding that a respondent failed to provide requested information under section 1677e(a), and Commerce is only authorized to use an adverse inference if it properly determined to use facts available. *Nippon Steel*, 337 F.3d at 1381 ("the statute has two distinct parts respectively addressing two distinct circumstances under which Commerce has received less than full and complete facts needed to make a determination"); *see also Dalian Meisen Woodworking Co. v. United States,* 2022 Ct. Int'l Trade LEXIS 52 (May 12, 2022), *15 ("The application of adverse facts available is, then, in most cases a two-step process."). Therefore, Commerce's use of an adverse inference, which is only permitted if the use of facts available is authorized in the first place, is unsupported by substantial evidence.

Even if the use of facts available were authorized under section 1677e(a), Commerce erred in determining to apply an adverse inference because Deosen was fully cooperative with Commerce's requests throughout the administrative review. Deosen timely responded to every questionnaire and supplemental questionnaire issued by Commerce; it fully participated in the CEP verification of Deosen USA's sales of subject merchandise in New Jersey, as well as the verification of Deosen Ordos' factors of production response in China; and it otherwise did everything within its ability to provide Commerce with the information it requested.

Moreover, Deosen was fully transparent in how it was reporting date of shipment by using Deosen USA's invoice date as a proxy and explained that Deosen USA does not track date of shipment in the ordinary course of business. *Cf. Shanghai Taoen Int'l Trading Co. v. United States*, 360 F. Supp. 3d 1339 (Ct. Int'l Trade 2005) (finding that AFA is permitted "where a respondent purposefully withholds, and provides misleading, information). As explained above, Deosen

19

reasonably believed that Commerce was requesting the date of shipment of merchandise from Deosen USA's perspective given the initial Section C questionnaire contained numerous questions on CEP sales and that Commerce's questionnaire did not specify which entity it was referring when requesting date of shipment.

Commerce recognized that Deosen USA does not record the date of shipment or delivery in the ordinary course of business but nonetheless found that "this fact pattern does not excuse Deosen from reporting the date of shipment from its Chinese factory." IDM at 13, P.R. 327. According to Commerce, "it was *within Deosen's ability* to report the shipment date from its Chinese factory to Commerce in its U.S. sales database" because Deosen USA could have requested the information from Deosen Ordos. IDM at 13-14 (emphasis in original). In addition, because the initial questionnaire was addressed to Deosen, not Deosen USA, Commerce indicates Deosen was responsible for completing the response based on Deosen Ordos' and Deosen USA's information.

But Commerce never clarified that it was requesting the date of shipment from the factory in China for Direct Delivery Sales and there was no reason for Deosen to believe that this was Commerce's expectation. As discussed above, the questionnaire did not specify whether the information sought was the date of shipment from Deosen Ordos' factory or Deosen USA's distribution warehouse. Because this section of the questionnaire requested information on CEP sales, Deosen reasonably interpreted Commerce's instruction to be requesting information regarding the date of shipment from Deosen USA's perspective.

Deosen did not know that this was an issue for Commerce because in the Preliminary Results Commerce accepted Deosen's reporting of the date of shipment and did not indicate this was an issue until it issued its verification report. If Commerce had notified Deosen that it required

the date of shipment from the factory in China for Direct Delivery Sales, Deosen may have been able to provide that information to Commerce. However, it was never given the opportunity to do so. This was not a failure to cooperate to the best of its ability by Deosen. At best, it is a misunderstanding based on ambiguity in Commerce's initial questionnaire. Even if Commerce was justified in applying facts available (which we disagree with), its determination to use an adverse inference is not supported by substantial evidence.

In the Final Results, Commerce recognized that the best of its ability "standard does not require perfection and recognizes that mistakes sometimes occur," but notes that the standard also "does not condone inattentiveness, carelessness, or inadequate record keeping." IDM at 14 (citing *Hyundai Electric & Energy Systems Co., Ltd. v. United States*, 578 F. Supp. 3d 1245 (Ct. Int'l Trade 2022); *Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003)). But here, there is no indication that Deosen was inattentive, careless, or did not maintain adequate records. Rather, Deosen reasonably interpreted Commerce's request for the date of shipment as applying to Deosen USA, responded to Commerce's request by providing a proxy date for both Warehouse Sales and Direct Delivery Sales, and clearly told Commerce in multiple questionnaire responses how it completed its reporting. Even if Deosen could have provided the date of shipment from China based on Deosen Ordos' records, Commerce never clarified the request in its ambiguous questionnaire, nor did it give Deosen an opportunity to provide the information. Deosen should not be faulted for "failing to act to the best of its ability" based on the lack of clarity in Commerce's questionnaire.

Deosen was fully cooperative during the administrative review and made a good faith effort to provide the information requested by Commerce. Commerce never clarified that it was requesting the date of shipment from China for Direct Delivery Sales and did not give Deosen an

opportunity to remedy any supposed deficiency in its reporting.  Thus, even if Commerce's use of facts available was permissible, its determination that Deosen failed to cooperate to the best of its ability is unsupported by substantial evidence and not in accordance with law.

## V.     <u>CONCLUSION</u>

For the reasons described above, Plaintiff respectfully requests that the Court remand the Final Results to Commerce.

Respectfully submitted,

Dated:  February 27, 2026

*/s/ Lian Yang*

Lian Yang
Alston & Bird LLP
950 F Street NW
Washington, DC 20004
(202) 239-3490
lian.yang@alston.com

*Counsel for Plaintiff*

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chambers Procedure 2(B), the undersigned certifies that this brief complies with the word limitation requirement. The word count for the Memorandum of Points and Authorities in Support of Plaintiff Deosen Biochemical (Ordos) Ltd.'s Motion for Judgment on the Agency Record, as computed by Alston & Bird LLP's word processing system (Microsoft 365), is 6,867 words.

Dated:  February 27, 2026

/s/Lian Yang
Lian Yang

On behalf of
Deosen Biochemical (Ordos) Ltd.